

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHICAGO DISTRICT COUNCIL OF ) <br> CARPENTERS PENSION FUND, et al. ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> REINKE INSULATION COMPANY ) <br> and K. REINKE, JR. & COMPANY, ) <br> ) <br> Defendant. ) <br> _____) <br> ) <br> REINKE INSULATION COMPANY ) <br> and K. REINKE, JR. & COMPANY, ) <br> ) <br> Counter-Plaintiffs ) <br> v. ) <br> ) <br> CHICAGO AND NORTHEAST ILLINOIS ) <br> DISTRICT COUNCIL OF CARPENTERS and ) <br> UNITED BROTHERHOOD OF CARPENTERS ) <br> AND JOINERS OF AMERICA, LOCAL 1307 ) <br> ) <br> Joined Counter-Defendants ) | Case No. 01 C 8102 <br><br> Wayne R. Andersen <br> U.S. District Judge |

## MEMORANDUM OPINION AND ORDER

Before the Court is the motion of Chicago and Northeast Illinois District Council of Carpenters and United Brotherhood of Carpenters and Joiners of America, Local 1307 for summary judgment. For the following reasons, the motion is granted.

## BACKGROUND

The defendants, K. Reinke and Reinke Insulation, both Illinois corporations under common ownership and control (collectively referred to as "Reinke"), are in the business of installing insulation at residential construction projects. Reinke employed insulation workers

who were members of the United Brotherhood of Carpenters and Joiners of America, Local 1307, which was affiliated with and operated under the Northeast Illinois District Council of Carpenters (Local 1307 and the Northeast Council are collectively referred to as the "Union"). Between July 31, 1997 and July 13, 1998, Reinke entered into certain agreements with the Residential Construction Employers Council ("RCEC"), which had negotiated collective bargaining agreements with the Union.

Reinke's agreement with the RCEC bound it to the terms of three collective bargaining agreements, which applied to all work performed by Reinke insulators within Cook, Lake, DuPage, Kane, Kendall, McHenry and Will Counties between July 1, 1998 and June 30, 2001. Among other things, the agreements provided that individual RCEC members would pay monthly fringe benefit contributions to the Chicago District Council of Carpenters' Trust Funds, including its apprentice and trainee program, and pension and welfare funds (collectively referred to as the "Trust Funds"). The Trust Funds could also cause the books and records of individual RCEC members to be reviewed and audited to confirm that the benefit contributions were properly remitted. On January 26, 2001, Reinke resigned from the RCEC and communicated its intention to negotiate a new collective bargaining agreement with the Union.

In the spring of 2001, the Trust Funds exercised their right to audit Reinke's records and retained the accounting firm of James Egan & Associates ("Egan") to review the company's books for the period of July 1998 through June 2001. In October 2001, Egan prepared a preliminary compliance audit report, which concluded the company had underpaid its required contributions by $142,441. Egan determined that Reinke failed to pay its insulators for "drive time" in accord with the working rules of the residential insulation industry adopted in the

collective bargaining agreements. Reinke carpenters who installed preformed batts of insulation were paid for drive time that depended on how far the job site was from the employer's supplier. Workers who drove to and from their supplier to pick up batts of insulation were paid for drive time, but carpenters who commuted from home were paid only for time at the installation sites. Under the collective bargaining agreement, every employee was required to complete and sign a "Uniform Daily Time Sheet" that separated actual time at work from drive time. The auditor concluded that most of the delinquent contributions came from Reinke's failure to remit contributions for travel time. Based on the final audit report, the Trust Funds sought $211,002 in contributions.

On October 22, 2001, the Trust Funds and their trustees filed this lawsuit for the alleged underpayment. On November 13, 2001, Reinke answered the complaint and filed a counterclaim. In October 2001, at the same time plaintiffs filed their lawsuit, District Council Business Representative Bill Rabinak authorized the commencement of picketing. From October 2001 to May 2002, the Union picketed at company job sites accusing Reinke of a "failure to pay fringe benefit contributions." (Union Facts ¶ 9.) On May 16, 2002, U.S. District Judge Philip Reinhard entered an injunction against the picketing pursuant to a request by the National Labor Relations Board. (*Id.* ¶ 12.) After the picketing stopped, the Union engaged in handbilling. The handbills read: "The HARD working employees of Reinke have been cheated on their MEDICAL and RETIREMENT contributions!" (*Id.* ¶ 16.)

In its counterclaim, Reinke alleges that, as a result of the Union pickets and the allegedly false allegations on the picketers' signs and handbills, the company had numerous contracts with its builders terminated and had been prevented from performing its existing contracts with

3

builders. It also named Egan in several counts alleging, *inter alia*, accounting malpractice and negligent misrepresentation.

From July 9 through July 12, 2002, plaintiffs tried the underlying benefits case in a bench trial. The Court entered judgment in favor of Reinke, having found the company made all contributions to the Trust Funds that were required of it during the audit period. *Chicago District Council, et al. v. Reinke Insulation Co., et al.*, No. 01 C 8102 (N.D. Ill. Jan. 14, 2003). The Seventh Circuit affirmed the decision. *Chicago District Council, et al. v. Reinke Insulation Co.*, 347 F.3d 262, 266 (7th Cir. 2003).

However, when this Court notified the parties orally of its judgment on August 1, 2002, it noted on the record that Reinke's record keeping raised legitimate questions as to whether it paid all of its fringe benefit contributions. (Union Facts ¶ 22.) This Court had noted earlier that Reinke's record keeping as it related to the Uniform Daily Time Sheets was incredibly inconsistent. (*Id.* ¶ 23.) On December 3, 2002, this Court addressed the inconsistencies in keeping of the time sheets:

> . . . Reinke screwed up their bookkeeping, raising in the minds of the Pension Funds reasonable questions with respect to what the true compensation was and, therefore, the contributions ought to be. And Egan came in, basically drew certain conclusions from screwed-up records. Actually came in twice. Ultimately I was persuaded by the testimony that you presented that your version of the truth was the truth. But as I sit here today, I do not blame either the Funds or Egan for feeling that they needed to audit, given the incredible inconsistencies . . . .

(Tr. at 8, Dec. 3, 2002, *Reinke* (No. 01 C 8102)).

This Court had also noted that the Trust Funds' auditors acted in good faith and that the Trust Funds had very reasonable questions as to whether Reinke paid all required benefit contributions. (Union Facts ¶¶ 24, 25.)

4

In August 2003, Reinke was granted leave to file a first amended counterclaim, which eliminated its claims against the accounting firm, but added others. In its amended counterclaim, Reinke has filed nine counts, which allege, respectively (1) civil conspiracy against the Trust Funds and the Union; (2) defamation against the Union; (3) false light against the Union; (4) trade libel against the Union; (5) tortious interference with contract against the Trust Funds and the Union; (6) tortious interference with prospective economic advantage against the Trust Funds and the Union; (7) violations of § 303 of the Labor Management Relations Act against the Union; (8) violations of the Illinois Consumer Fraud Act against the Union; and (9) violations of the Uniform Deceptive Trade Practices Act against the Union.

In a stipulation dated September 20, 2004, Reinke agreed to dismiss count I, the civil conspiracy claim and agreed to dismiss the Trust Funds from counts V and VI, the tortious interference with contract and prospective economic advantage actions. As a result, there are no pending counterclaims against the Trust Funds. Before the Court is the Union's motion for summary judgment on the eight remaining counts.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court's function is "'not to weigh the evidence but merely to determine if 'there is a genuine issue for trial.'" *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of material

fact exists only if a "fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

In assessing whether a genuine issue of material fact exists in a case, the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See id.* at 255. However, neither "the mere existence of some alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), is sufficient to defeat a motion for summary judgment. *See also Skorup v. Modern Door Corp.*, 153 F.3d 512, 514 (7th Cir. 1998).

## DISCUSSION

### I. Counts II – Defamation

In Count II, Reinke alleges that the Union's assertions on its pickets and handbills of Reinke's failure to pay fringe benefits constitutes publication of false and defamatory statements. It asserts the Union published the false and defamatory statements with knowledge of their falsity, or with reckless disregard for the truth. (Countercl. ¶¶ 50-55.)

State defamation claims arising from statements made in labor disputes are preempted by federal labor law unless those statements are made with knowledge of their falsity or with reckless disregard for the truth. *Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 61 (1966). In *Linn*, the Supreme Court fashioned limits on defamation claims because of concerns for "unwarranted intrusion upon free discussion envisioned" under federal labor laws. *Id.* The Court imposed a malice requirement that a plaintiff prove that a publication was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Old Dominion Branch*

*No. 496 v. Austin*, 418 U.S. 264, 281 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).

On a summary judgment motion in a defamation action in which the actual malice standard applies, the plaintiff is not only required to produce evidence creating a genuine issue of material fact, but is additionally required to produce evidence that a jury could find is clear and convincing evidence that the defendant acted with knowledge that the statements were false or with reckless disregard for the statements' truth or falsity. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-53 (1986)("[W]here the First Amendment mandates a "clear and convincing" standard, the trial judge in disposing of a directed verdict motion should consider whether a reasonable fact-finder could conclude, for example, that the plaintiff had shown actual malice with convincing clarity.") Thus, in this case, Reinke bears the burden of demonstrating by clear and convincing evidence that the Union acted with actual malice, i.e., that it knew, at the beginning of its picketing in October 2001, that the preliminary audit was false or acted with a reckless disregard for whether the audit was false. *Masson v. New Yorker Magazine*, 501 U.S. 496, 508 (1991).

Here, the Court finds that Reinke cannot meet this standard. When the Union began picketing in October 2001, it knew (1) the preliminary audit stated that Reinke owed $142,441 in delinquent contributions; (2) the Trust Funds had filed a lawsuit in federal court to seek those contributions; and (3) the Trust Funds and Egan desired additional information from Reinke's books and records that was not forthcoming. At the start of the handbill campaign in May 2002, the Union knew the Trust Funds continued to seek the audit discrepancies. Reinke alleges the Union acted with actual malice because it rejected an offer made by the company to place the

7

disputed funds in escrow pending resolution of the dispute. However, the Union maintains that it rejected the offer because the money could not be applied to employees for purposes of pension and health insurance eligibility and did not address the outstanding request for books and records. In addition, Union Business Representative Bill Rabinak, who authorized the picketing, was unaware of the offer. (Union Facts ¶ 11.)

Indeed, this Court determined during the underlying benefits trial that the Trust Funds had very reasonable questions as to whether Reinke paid all required benefit contributions. (*Id.* ¶¶ 24, 25.) No facts have been presented, upon this Court's careful review of the record, which suggest that the Union knew, at the beginning of its picketing in October 2001, that the preliminary audit was false or that it acted with a reckless disregard for whether the audit was false.

The Union had the clear right under federal labor law to engage in peaceful strike activities under § 13 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 163. Employees' rights under the NLRA to engage in peaceful strike activity against employers includes the right to picket the employer. *See N.L.R.B. v. Schwab Foods, Inc.*, 858 F.2d 1285, 1289 (7th Cir. 1998); 29 U.S.C. §§ 157, 158(a)(1), 163. Furthermore, a union is given "license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." *Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 60-61.

The Union's peaceful strike activities in this case were triggered by its legitimate belief that Reinke was delinquent in making benefit contributions. When the Union learned of this Court's ruling on August 1, 2002 that Reinke was not delinquent in making its contributions, the Union immediately ceased its activities.

8

This Court finds, therefore, that, after careful review of undisputed facts in this case, Reinke cannot bear its burden of demonstrating at trial that the Union acted with actual malice. We also hold that the use of the word "cheating" in its handbilling was rhetorical hyperbole that Illinois courts have deemed non-actionable. *See Pease v. Int'l Union of Operating Engineers*, 567 N.E.2d 614, 619 (2d Dist. 1991). Because we find that there are no genuine issues of material fact as to whether the Union acted with actual malice, Reinke's state defamation suit is preempted and, therefore, we grant the Union's motion for summary judgment on Count II.

## II. Counts III and IV – False Light and Trade Libel

In Count III, Reinke alleges it was placed in a false light before the public as a result of the statements about Reinke that were recited in the Union's pickets and handbills. (Countercl. ¶ 61.) As was required for an actionable defamation claim, Reinke is required in Count III to prove that the Union, in addition to placing Reinke in a false light before the public, acted with actual malice. *Sullivan v. Conway*, 959 F. Supp. 877 (N.D. Ill. 1997); *Aroonsakul v. Shannon*, 664 N.E.2d 1094 (2d Dist. 1996). (*Id.* ¶ 67.)

In Count IV, Reinke has filed a trade libel action alleging the statements published by the Union on its pickets and handbills disparaged Reinke and held it out to be unfit to operate its business. A plaintiff bringing a trade libel action also must prove actual malice, that is, the defendant published defamatory statements "with knowledge of their falsity or with reckless disregard of whether they were true or false." *Lowe Excavating Co. v. Operating Eng.*, 765 N.E.2d 21, 30-31 (2d Dist. 2002)(quoting *Linn*, 383 U.S. at 65).

Because we have already determined that Reinke cannot prove that the Union knew the Egan audits were false or acted with reckless disregard for whether the audits were false, we also

find that it cannot show the Union acted with the requisite malice to succeed under its false light and trade libel claims. We believe there is no evidence that the Union "entertained serious doubt" about whether the Egan audits were correct. *See, e.g., Lowe*, 765 N.E.2d at 30-31.

## III. Counts V, VI, and VIII – Preempted State Law Claims

Counts V, VI, and VIII are state law claims that are preempted by federal labor law. In Count V, Reinke alleges a claim of tortious interference with a contract. In this count, the company alleges the picketing and handbilling campaign constituted wrongful and tortious conduct and that, as a result, one or more of the builders and general contractors with which Reinke conducted business terminated their contracts. (Countercl. ¶ 73.)

In its closely related Count VI, Reinke makes a similar allegation of tortious interference with a prospective economic advantage, maintaining it was under consideration for a number of construction projects and, as a result of the picketing and handbilling campaign, lost prospective business. (*Id.* ¶ 79-80.)

In Count VIII, Reinke brings another state law claim for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. In this count, Reinke claims the Union's allegedly defamatory statements were directed to various builders with whom Reinke did business, other contractors and laborers in other building trades, and the public at large. (*Id.* ¶ 91.)

Claims of tortious interference with contractual relations or prospective economic advantage and claims for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, when based on conduct that is regulated by the Labor-Management Relations Act,

29 U.S.C. § 141, *et seq.*, are subject to federal preemption. *See Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240-41 (7th Cir. 1996).

The Supreme Court has held that state law may not encroach upon the systems of federal laws governing labor relations. *Teamsters v. Morton*, 377 U.S. 252, 259-60 (1964). State laws which attempt to occupy the same or similar ground as the national scheme are preempted. *Id.* The essential inquiry is "whether evaluation of the claims is inextricably intertwined with consideration of the terms of a labor contract." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399 (1988). The exception to the preemption doctrine for tortious interference claims is when there is "conduct marked by violence and imminent threats to the public order." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959).

In this case, the parties were required to interpret the collective bargaining agreement to determine whether, under its terms, Reinke failed to make the required Trust Fund contributions. The state law claims here are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985). In fact, this Court conducted a week long bench trial to make a determination of whether Reinke paid fringe benefits in accord with the collective bargaining agreement's terms.

Because Reinke's state tort claims are inextricably intertwined with the terms of the labor contract, Counts V, VI, and VIII are preempted by federal labor law. Furthermore, because Reinke makes no allegation that the Union engaged in violent conduct or made improper threats to the public order, Reinke's claims are not exempt from preemption. For these reasons, we grant the Union's motion for summary judgment on Counts V, VI, and VIII.

## IV. Count VII – Section 303 of the Labor-Management Relations Act

In Count VII, Reinke alleges the Union engaged in striking activity "for the purpose of forcing K. Reinke to rejoin the RCEC and reassign its collective bargaining rights and responsibilities to the [Residential Construction Employers Council] . . . ." (Countercl. ¶ 84.) Under Section 303 of the Labor-Management Relations Act, 29 U.S.C. § 141, *et seq.*, injured parties may sue a labor organization engaged in "any activity or conduct defined as an unfair labor practice in section 158(b)(4) . . . ." 29 U.S.C. § 187. Section 158(b)(4) makes it unlawful for labor organizations to engage in strike activities where the object is "forcing or requiring any employer . . . to join any labor or employer organization . . . ." *Id.*

In its brief, Reinke argues that was illegal for the Union, under the plain terms of § 158(b)(4), to picket if its motive was to force Reinke to rejoin the Residential Construction Employers Council. The prohibition set forth in § 158(b)(4), however, is aimed at striking activities directed at secondary employers, not primary employers. *Mautz & Oren Inc. v. Teamsters, Local No. 279*, 882 F.2d 1117, 1120-21 (7th Cir. 1989). When a union has a grievance against the primary employer, in this case Reinke, it may picket that employer, but may not exert pressure on an unrelated, secondary employer to coerce the secondary employer to cease dealing with the primary employer, thereby advancing the union's goals indirectly. *Id.* "The controlling legal principles are well settled. Only 'secondary' conduct is proscribed by §§ 8(b)(4)(A) and 8(b)(4)(B) [§§ 158(b)(4)(A) and (B)] . . . Those provisions are aimed at 'shielding unoffending employers and others from pressures in controversies not their own.'" *Hoffman & Sons, Inc. v. Int. Bhd. of Teamsters, Local No. 627*, 617 F.2d 1234, 1241 (7th Cir. 1980)(internal citation omitted).

12

The Supreme Court explained that the § 158(b)(4) provisions cannot be literally construed, or else the provisions would "ban most strikes historically considered to be primary activity." *Int'l Union of Elec. Radio & Mach. Workers v. NLRB*, 366 U.S. 667, 672 (1961). Indeed, § 303 "renders illegal various forms of secondary boycotting, while clarifying in its proviso that primary strikes and pickets are exempt from its terms." *J. Pease Const. Co., et al. v. Local 150*, No. 87 C 10515, 1992 U.S. Dist. LEXIS 5659, at *2-3 (N.D. Ill. Apr. 6, 1992).

To be liable for secondary activity under § 303, a union must have as its object or purpose the coercion of secondary employers. *Mautz & Oren Inc.*, 882 F.2d at 1121. The Union in this case picketed Reinke with signs that protested Reinke's "failure to pay fringe benefit contributions." (Union Facts ¶ 9.) These picket signs were used at locations at which Reinke employees were present at residential projects for the purpose of installing insulation. (*Id.* ¶ 33.) Thus, activity directed at Reinke is deemed primary and is protected.

The analysis of secondary conduct changes when primary and secondary employers (e.g. subcontractors) share a common work site, as is common in the construction industry. Despite the presence of these other secondary employers, the Union may engage in a lawful picket as long as the focus in on the primary employer. To evaluate the Union's conduct when other employees are present, federal courts use the *Moore Dry Dock* standards. *Sailors' Union of the Pacific (Moore Dry Dock)*, 92 N.L.R.B. 547, 549 (1950).

Under these standards, a union's picketing is presumed to be lawful primary activity if: (a) the picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location

13

of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer. *Mautz & Oren Inc.*, 882 F.2d at 1121.

After carefully reviewing the facts in this case, we conclude the Union conducted itself in accord with the *Moore Dry Dock* standards. First, the Union picketed only construction job sites where Reinke installed insulation on houses under construction at times that Reinke employees were present on those sites. Second, when the picketing occurred, Reinke employees were present for the purpose of installing insulation on the homes under construction. Third, the picketing occurred reasonably close to where Reinke employees were present, including reserve gates established by owners or general contractors. Finally, the picket signs clearly protested Reinke's failure to pay fringe benefit contributions and, thus, the pickets disclosed clearly that the dispute was with Reinke, the primary employer.

Because the Union cannot be held liable under § 303 for its picketing of Reinke, the primary employer, and because there are no genuine issues of material fact left to be decided regarding the Union's picketing of secondary employers, we grant the Union's motion for summary judgment on Count VII.

## V. Count IX – Uniform Deceptive Trade Practices Act

In Count IX, Reinke alleges the Union's statements "disparaged Reinke's business by false and misleading misrepresentations of fact, and constituted a deceptive trade practice in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, *et seq*. The Uniform Deceptive Trade Practices Act does not provide a cause of action for damages, but it does permit private suits for injunctive relief. *Greenberg v. United Airlines*, 563 N.E.2d 1031, 1036 (1st Dist.

1990). Accordingly, Reinke's claim under the Uniform Deceptive Trade Practices Act is moot as injunctive relief is no longer available due to the absence of continued picketing or handbilling.

Moreover, Reinke is required to prove the Union knew its statements were untrue or intended to misrepresent a statement to the public. *Berthold Types Ltd. v. Adobe Sys.*, 101 F. Supp. 2d 697, 699 (N.D. Ill. 2000). For the same reasons we concluded the Union did not act with actual malice in previous claims, the Union in this count cannot be found to possess the knowledge that the handbills and pickets, which it believed expressed honest assertions, would "disparage the goods, services, or business of [Reinke] by false or misleading representations of fact." 815 ILCS 510/2(a)(8). Accordingly, we grant the Union's motion for summary judgment on Count IX.

## CONCLUSION

For the foregoing reasons, we grant the Union's motion for summary judgment [104-1]. This is a final and appealable order. It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: August 1, 2005

15